**JASSY VICK CAROLAN** LLP
JEAN-PAUL JASSY, Cal Bar No. 205513
  jpjassy@jassyvick.com
JEFFREY A. PAYNE, Cal. Bar No. 279034
  jpayne@jassyvick.com
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone:  310-870-7048
Facsimile:   310-870-7010

Attorneys for Defendants
JOSEPH MORESCO and LISA ELIN

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN HENDEL, an individual; RUTH HENDEL, an individual; and KNITTING FACTORY ENTERTAINMENT, INC., a Delaware corporation,<br><br>p                     Plaintiffs,<br><br>       vs.<br><br>JOSEPH MORESCO, an individual; LISA ELIN, an individual; and DOES 1 through 5, inclusive,<br><br>              Defendants. | Case No. 5:23-cv-01987-HDV-SHK<br><br>Honorable Hernán D. Vera<br><br>**NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16**<br><br>**Date:**             **February 15, 2024**<br>**Time:**             **10:00 a.m.**<br>**Courtroom:**      **5B** |

1    TO THE HONORABLE COURT AND ALL PARTIES AND THEIR

2    COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE that on Thursday, February 15, 2024, at 10:00 a.m.,

4    or as soon thereafter as counsel may be in Courtroom 5B, 5th Floor, the Honorable

5    Hernán D. Vera, presiding, located at 350 West First Street, Los Angeles, California

6    90012, defendants Joseph Moresco and Lisa Elin (collectively, "Defendants"), and

7    each of them individually, will and hereby do move this Court for an order striking

8    the Complaint, and each and every claim (or "count") in Plaintiffs Stephen Hendel,

9    Ruth Hendel, and Knitting Factory Entertainment, Inc.'s (collectively, "Plaintiffs")

10   Complaint pursuant to California Code of Civil Procedure section 425.16 ("Section

11   425.16" or the "anti-SLAPP[1] statute"), analyzed under the standards of Federal Rule

12   of Civil Procedure 56. *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1156 (9th

13   Cir. 2021).

14   **This Motion is made following a conference of counsel pursuant to Local**

15   **Rule of Court 7-3 which took place on December 11, 2023.**

16   Plaintiffs' first, second, and third claims for defamation per se and fourth and

17   fifth claims for false light are each based entirely on speech and alleged conduct in

18   furtherance of speech contained on an internet website, all of which is in connection

19   with matters of public interest, and therefore each claim falls within the scope of

20   Section 425.16(e). The burden therefore shifts to Plaintiffs to establish a probability

21   of prevailing on each of those claims. Cal. Code Civ. Proc. § 425.16(b)(1). Plaintiffs

22   cannot satisfy that burden. Plaintiffs' entire Complaint, and each of Plaintiffs' claims

23   therein, should be dismissed and stricken with prejudice, and without leave to amend,

24   because neither of the Defendants published the website at issue or any of the alleged

25   statements at issue contained therein.

26

27   [1] SLAPP is an acronym that stands for "Strategic Lawsuits Against Public
     Participation."

28

1    This Motion is based on this Notice; the attached Memorandum of Points and

2  Authorities; the attached declarations of Joseph Moresco, Lisa Elin, and Jeffrey

3  Payne with Exhibits 1–26; all pleadings and documents on file in this action; and

4  such further judicially noticeable evidence or argument as may be presented at the

5  hearing on this Motion.

6    For these reasons, Defendants respectfully request that this Court strike

7  Plaintiffs' first, second, third, fourth, fifth, and sixth claims (i.e., Plaintiffs' entire

8  Complaint) with prejudice and without leave to amend.

9    Defendants also request that the Court enter an award of attorneys' fees and

10  costs pursuant to California Code of Civil Procedure section 425.16(c).[2]

11

12

13  Dated:  December 18, 2023                    JASSY VICK CAROLAN LLP

14                                              By:   */s/ Jeffrey A. Payne*
                                                Jeffrey A. Payne

15
                                                Attorneys for Defendants
16                                              JOSEPH MORESCO and LISA ELIN

17

18

19

20

21

22

23

24

25

26

27  _____

[2] If this Motion, or any part thereof, is granted, Defendants will file a noticed motion
28  to recover attorneys' fees and costs.

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................1

II.   STATEMENT OF FACTS ....................................................................2

    A.    Pappy & Harriet's .......................................................................2

    B.    The Pappy Litigation...................................................................2

    C.    The StephenHendel.net Website ................................................3

III.  LEGAL ANALYSIS .............................................................................5

    A.    The Anti-SLAPP Statute Applies to All of Plaintiffs' Claims ...............5

        1.    California's anti-SLAPP statute applies in federal court .............5

        2.    The anti-SLAPP statute is construed broadly................................6

    B.    The First Step in the Anti-SLAPP Analysis Is Satisfied .........................7

        1.    Each of the claims in the Complaint fits within Section 425.16(e)(2) because the Website contains statements concerning the Pappy Litigation......................................................7

        2.    Each of Plaintiffs' claims also fall within Sections 425.16(e)(3) and (e)(4) because they depend entirely on the exercise of free speech in a public forum in connection with multiple public figures and matters of public interest ............................................9

            a.    The Pappy Litigation is an issue of public interest..............11

            b.    Stephen and Ruth Hendel are public figures about whom the Website contains statements on issues of public interest........................................................................12

                i.    Stephen Hendel the oil commodities trader ................12

                ii.    Stephen and Ruth Hendel the producers ......................13

            c.    Fela Kuti was a public figure about whom the Website contains statements on issues of public interest .................14

C.   Plaintiffs Cannot Satisfy Their Burden on the Second Step of the Anti-SLAPP Analysis Because Defendants Did Not Publish the Website..................................................................................................16

IV.   CONCLUSION ..............................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atl. Recording Corp. v. Serrano*,
   No. 07-CV-1824 W(JMA), 2007 WL 4612921 (S.D. Cal. 2007)....................17

*Barrett v. Rosenthal*,
   40 Cal. 4th 33 (2006)...................................................................................9

*Briggs v. Eden Council for Hope & Opportunity*,
   19 Cal. 4th 1106 (1999)..............................................................................10

*Carlisle v. Fawcett Pubs., Inc.*,
   201 Cal. App. 2d 733 (1962).......................................................................13

*City of Colton v. Singletary*,
   206 Cal. App. 4th 751 (2012)........................................................................7

*City of Costa Mesa v. D'Alessio Invs., LLC*,
   214 Cal. App. 4th 358 (2013).......................................................................9

*Cole v. Patricia A. Meyer & Assocs., APC*,
   206 Cal. App. 4th 1095 (2012).....................................................................9

*Copp v. Paxton*,
   45 Cal. App. 4th 829 (1996)........................................................................12

*Couch v. San Juan Unified Sch. Dist.*,
   33 Cal. App. 4th 1491 (1995)......................................................................17

*Cross v. Cooper*,
   197 Cal. App. 4th 357 (2011)......................................................................10

*Doe v. Gangland Prods., Inc.*,
   730 F.3d 946 (9th Cir. 2013).......................................................................16

*Equilon Enters. v. Consumer Cause, Inc.*,
   29 Cal. 4th 53 (2002)...................................................................................6

*FilmOn.com Inc. v. DoubleVerify Inc.*,
   7 Cal. 5th 133 (2019)................................................................... 10, 12, 13

*Geiser v. Kuhns*,
   13 Cal. 5th 1238 (2022)..............................................................................10

*Gilbert v. Sykes*,
   147 Cal. App. 4th 13 (2007)................................................................. 10, 17

SPECIAL MOTION TO STRIKE COMPLAINT

*Global Telemedia Int'l, Inc. v. Doe 1*,
    132 F. Supp. 2d 1261 (C.D. Cal. 2001)........................................................16

*Herring Networks, Inc. v. Maddow*,
    8 F.4th 1148 (9th Cir. 2021)............................................. 6, 7, 16, 17

*Hilton v. Hallmark Cards*,
    599 F.3d 894 (9th Cir. 2010)....................................................11

*Nadel v. Regents of the Univ. of Calif.*,
    28 Cal. App. 4th 1251 (1994)..................................................12

*Navellier v. Sletten*,
    29 Cal. 4th 82 (2002)...............................................................7

*Neville v. Chudacoff*,
    160 Cal. App. 4th 1255 (2008)................................................8

*Nicosia v. DeRooy*,
    72 F. Supp. 2d 1093 (N.D. Cal. 1999) ...................................16

*Nygård, Inc. v. Uusi-Kerttula*,
    159 Cal. App. 4th 1027 (2008)..............................................10

*Obsidian Financial Group, LLC v. Cox*,
    740 F.3d 1284, 1293–94 (9th Cir. 2014) ...............................16

*Sarver v. Chartier*,
    813 F.3d 891 (9th Cir. 2016).....................................................6

*Thomas v. L.A. Times Commc'ns, LLC*,
    189 F. Supp. 2d 1005 (C.D. Cal. 2002)..................................12

*Traditional Cat Ass'n, Inc. v. Gilbreath*,
    118 Cal. App. 4th 392 (2004)..................................................11

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*,
    190 F.3d 963 (9th Cir. 1999)....................................................6

*Varian Med. Sys., Inc. v. Delfino*,
    35 Cal. 4th 180 (2005)..............................................................6

*Wong v. Tai Jing*,
    189 Cal. App. 4th 1354 (2010)................................................17

## U.S. CONSTITUTION

First Amendment ................................................................................................7

## STATE STATUTES

Cal. Civil Code § 47(d)........................................................................................3

Cal. Code of Civil Procedure
 § 425.16 ..................................................................................... 5, 6, 7, 8
 § 425.16(a).................................................................................................6
 § 425.16(b)(1).............................................................................................6
 § 425.16(e) ........................................................................................... 7, 10
 § 425.16(e)(2) ................................................................................... 7, 8, 11
 § 425.16(e)(3) ....................................................................... 7, 9, 10, 11, 16
 § 425.16(e)(4) ....................................................................... 7, 9, 10, 11, 16

## MISCELLANEOUS

https://theafricasoftpowerproject.com/stephen-hendel/#:~:text=
 Stephen%20Hendel%20graduated%20with%20a,in%20energy%20
 and%20associated%20industries  ........................................................4

https://www.broadway.com/buzz/154214/author-brings-lawsuit-against-
 broadways-fela/  ..................................................................................4

SPECIAL MOTION TO STRIKE COMPLAINT

## I.      INTRODUCTION

Defendants Joseph "JB" Moresco and Lisa Elin did not publish the allegedly false and defamatory statements that serve as the basis for all of Plaintiffs' claims.

This lawsuit is a transparent and ill-conceived effort to gain leverage over Moresco and Elin (collectively "Defendants") just before trial in related litigation pending in state court. Defendants and Plaintiff Stephen Hendel are embroiled in an acrimonious lawsuit in Los Angeles Superior Court regarding Moresco and Elin's April 2021 purchase—with an investment from Hendel—of Pappy & Harriet's, a popular bar, restaurant, and music venue near Joshua Tree, California. The parties in the so-called "Pappy Litigation" agreed on or about September 1, 2023, to mediate that case, and the mediation took place on October 27, 2023. This case was filed on September 28—just one month after the parties agreed to mediate and one month before the mediation took place. Trial in the state court action is set to begin January 29, 2024.

Stephen Hendel and Plaintiff Knitting Factory Entertainment (of which Stephen is a majority owner) factor prominently in the Pappy Litigation. They, along with Stephen's wife, Ruth Hendel, contend in this case that Defendants published a website online at http://stephenhendel.net that contains purportedly false and defamatory statements against each Plaintiff. At most, that website advances protected rhetorical hyperbole to comment on and criticize the Pappy Litigation and multiple public figures on issues of public importance.

By commenting directly on ongoing litigation and persons and issues of public interest, the website is a classic example of speech in a public forum. And by alleging claims that all depend entirely—and directly—on statements on the website, Plaintiffs' entire Complaint falls within the ambit of California's anti-SLAPP statute. Plaintiffs therefore bear the burden to demonstrate a probability of success on each of their claims. They cannot satisfy that burden because neither Moresco nor Elin had anything to do with the website or any of its contents. Neither Moresco nor Elin even

knew about the website until this lawsuit was filed—let alone registered the domain or supplied or published its contents.

Defendants' anti-SLAPP motion should therefore be granted in full, and the Court should dismiss Plaintiffs' complaint with prejudice and without leave to amend.

## II.    STATEMENT OF FACTS

### A.    Pappy & Harriet's

Pioneertown, California sits four miles north of Yucca Valley, not far from Joshua Tree, with a population below 600. Ex. 3.[1] In the 1940s, filmmakers built a cantina set that was used in multiple Western films. Ex. 4 at 6; Ex. 6 at 4. Claude "Pappy" Allen and his wife Harriet bought that cantina in 1982 and renamed it Pappy & Harriet's. Ex. 3 at 2; Ex. 4 at 6; Ex. 6 at 4. Under Pappy and Harriet's stewardship, Pappy & Harriet's "evolved into a kind of oasis for motorcycling misfits and thirsty desert musicians." Ex. 3 at 2. Pappy died in 1994, and Harriet ultimately sold the cantina in 2003 to a New York couple that built Pappy & Harriet's into a destination restaurant and venue that has since seen performances from hundreds of musicians, including Paul McCartney, Lana Del Rey, and Queens of the Stone Age, to name a few. *Id.*

### B.    The Pappy Litigation

With the help of an investment from Plaintiff Stephen Hendel, Defendants JB Moresco and Lisa Elin purchased Pappy & Harriet's in April 2021. Moresco Decl. ¶ 2; Elin Decl. ¶ 2. Just two months later, in June 2021, Hendel's special-purpose entity for the transaction, S&H Desert Depot LLC, sued Moresco and Elin (along with various corporate entities involved in the transaction) in Los Angeles Superior

---

[1] Citations to "Ex." in this brief refer to the exhibits attached to the declarations of Joseph Moresco and Jeffrey Payne filed in support of this motion. Exhibit 1 is attached to the Moresco declaration; Exhibits 2 through 26 are attached to the Payne declaration.

SPECIAL MOTION TO STRIKE COMPLAINT

Court, alleging several claims arising entirely from the 2021 Pappy & Harriet's purchase transaction (the "Pappy Litigation"). Moresco Decl. ¶ 2 & Ex. 1; Elin Decl. ¶ 2.

The Pappy Litigation has since garnered widespread public attention online and in the press, including in mainstream media outlets like the *Los Angeles Times* (Ex. 3), *Billboard* (Ex. 4), and the leading daily newspaper in Palm Springs and the surrounding Coachella Valley, *The Desert Sun* (Ex. 5). Neither Moresco nor Elin sought out any of this press or publicity, and neither of them personally responded to any request for comment regarding the Pappy Litigation from any news outlet.[2] Moresco Decl. ¶ 3; Elin Decl. ¶ 3.

### C.    The StephenHendel.net Website

At some point, a website titled "Stephen Hendel: A Fela Full of Failures" appeared online at http://stephenhendel.net (the "Website"). *E.g.*, Ex. 2; Compl. ¶ 3. The website poses a series of questions—with accompanying opinions (couched as answers) that sometimes cite online news articles and social media posts—that criticize Stephen and his wife Ruth Hendel, with a particular focus on Stephen Hendel's ownership of Plaintiff Knitting Factory Entertainment, long professional history as an oil commodities trader, and public support for and investments related to the popular Nigerian musician Fela Kuti. *See generally* Ex. 2.[3] The first two paragraphs on the Website summarize its gripes with the Hendels and Knitting Factory Entertainment: "Stephen Hendel is the owner of Knitting Factory. He is a

---

[2] Moresco and Elin's attorneys in the Pappy Litigation gave brief statements about the case to *Billboard* and the *Los Angeles Times* for their coverage of the litigation, Ex. 3 at 7; Ex. 4 at 10; Moresco Decl. ¶ 3; Elin Decl. ¶ 3. While not defamatory and not at issue in this case, Defendants' attorneys' brief statements about the Pappy Litigation to the *Los Angeles Times* and *Billboard* are absolutely privileged under California Civil Code section 47(d).

[3] Knitting Factory Entertainment's "holdings include music venues and brew pubs, theatrical and music management arms, a pair of record labels and a national touring division." Ex. 3 at 14. One of its labels, Knitting Factory Records, represents, and promotes Fela Kuti's music. Ex. 22; *see also* Ex. 23.

billionaire who made his money trading oil commodities. He owns the Fela Kuti catalogue[4] and has an odd fixation with the late Nigerian musician who was found to have married 27 women in one day. Hendel partnered with Jay-Z and Beyonce, along with Will and Jada Pinkett Smith to fund and produce Fela! The Musical.[5]"

The Website continues with variations on these themes. For example, the Website posits that "Fela Kuti was publicly outed several years ago" and asks, "Why are there no reparations for the children and women abused by Fela who had 27 'wives'?" Ex. 2 at 15–16. It goes on to opine: "The Hendels still make money off of his estate and the music of his son, Fema Kuti. Fema constantly works off the blood money from his father and Knitting Factory. What reparations has Fema made? There are public websites selling tons of branded merch and music related to the "complicated" story which is Fela! On Broadway and making more blood money off the rape, molestation and abuse of children and women." *Id.* at 15.

Another example on the Website references "blood money" when it asks, "Why does Hendel deal in African blood money and oil commodities" and links to an X (formerly Twitter) post suggesting that Hendel used his production and financing of "Fela! The Musical" to "wash[] his blood oil money" that he made as an oil commodities trader. *Id.* at 15.

Moresco and Elin learned of the Website for the first time when they learned about this lawsuit. Moresco Decl. ¶ 4; Elin Decl. ¶ 4. They did not receive any type of demand for retraction or takedown notice from Plaintiffs or their counsel before this

---

[4] The Website includes a hyperlink to https://theafricasoftpowerproject.com/stephen-hendel/#:~:text=Stephen%20Hendel%20graduated%20with%20a,in%20energy%20and%20associated%20industries in support of the phrase "He owns the Fela Kuti catalogue." Payne Decl. ¶ 11. A printout of that website is attached as Exhibit 10 to the declaration of Jeffrey Payne submitted in support of this motion.

[5] The Website includes a hyperlink to https://www.broadway.com/buzz/154214/author-brings-lawsuit-against-broadways-fela/ in support of the phrase "fund and produce Fela! The Musical." Payne Decl. ¶ 25. A printout of that website is attached as Exhibit 24 to the Payne Declaration.

SPECIAL MOTION TO STRIKE COMPLAINT

lawsuit was filed. Moresco Decl. ¶ 4; Elin Decl. ¶ 4.[6] Neither Moresco nor Elin had

any inkling that the Website existed until Stephen and Ruth Hendel and Knitting

Factory Entertainment publicly accused them—without any evidentiary basis or prior

inquiry or notice—of creating and publishing the Website. Moresco Decl. ¶ 4; Elin

Decl. ¶ 4.

Neither Moresco nor Elin played any role in registering the stephenhendel.net

domain name, nor do they know who did. Moresco Decl. ¶¶ 5–6; Elin Decl. ¶¶ 5–6.

They did not create or play any part in the creation of the Website itself or any of its

contents, nor do they know who did. Moresco Decl. ¶¶ 5, 7; Elin Decl. ¶¶ 5, 7. Nor do

Moresco or Elin have any idea when the Website was registered or appeared online.[7]

Moresco Decl. ¶¶ 4–6; Elin Decl. ¶¶ 4–6. The Complaint's specious accusation—

alleged on information and belief—that Moresco and Elin "are working with others to

publish defamatory and false statements about Plaintiffs in order to gain an advantage

in the Pappy Litigation," Compl. ¶ 19, lacks any factual or evidentiary support—and

the Complaint conspicuously cites none. Moresco and Elin categorically and

unequivocally deny any involvement in the publication of the Website. Moresco

Decl. ¶ 5; Elin Decl. ¶ 5.

## III.    LEGAL ANALYSIS

### A.    The Anti-SLAPP Statute Applies to All of Plaintiffs' Claims

#### 1.    California's anti-SLAPP statute applies in federal court.

The Ninth Circuit has made clear that California's anti-SLAPP statute, Cal.

Code Civ. Proc. § 425.16 ("Section 425.16"), applies in federal cases with state law

claims because the statute was "crafted to serve an interest not directly addressed by

---

[6] By contrast, Plaintiffs allege that their counsel, who are also counsel in the Pappy Litigation and obviously know how to contact Defendants' lawyers, sent *two* takedown notices to the purported web hosting company of the Website. Compl. ¶¶ 41–42.

[7] Plaintiffs allege (without support) that the Website was registered on March 22, 2023. Compl. ¶ 30. Moresco and Elin have no independent knowledge of this purported fact. *See* Moresco Decl. ¶¶ 7–9; Elin Decl. ¶¶ 7–9.

the Federal Rules: the protection of 'the constitutional rights of freedom of speech and petition for redress of grievances.'" *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972–73 (9th Cir. 1999); *see also Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021). Plaintiffs invoke this Court's diversity jurisdiction over the Complaint's state-law claims. Compl. ¶ 13.

In federal court, anti-SLAPP motions are divided "into two categories: motions that challenge the legal sufficiency of complaints and motions that challenge the factual sufficiency of complaints. The former of these categories are analyzed pursuant to Rule 12; the latter are analyzed pursuant to Rule 56." *Herring Networks*, 8 F.4th at 1156 (citation omitted).[8]

### 2.     The anti-SLAPP statute is construed broadly.

The anti-SLAPP statute was enacted to check "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional right of freedom of speech and petition," and it is to be "construed broadly." Cal. Code Civ. Proc. § 425.16(a). The law creates a "two-step process for determining" whether a cause of action should be stricken under Section 425.16. *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 192 (2005); Cal. Code Civ. Proc. § 425.16(b)(1).

In the first step, the court decides "whether the defendant has made a threshold showing that . . . the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech . . . in connection with a public issue.'" *Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002); *Herring Networks*, 8 F.4th at 1155 (same). Subdivision (e) of the anti-SLAPP statute covers, *inter alia*, any "conduct in furtherance of the exercise of the constitutional

---

[8] Federal courts in the Ninth Circuit apply their "own rules of procedure" in lieu of the anti-SLAPP "statute's 60-day time frame" in which to file an anti-SLAPP motion. *Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016). Under those federal rules, Defendants' anti-SLAPP motion is timely filed. *Id.*

right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Code Civ. Proc. § 425.16(e)(4).

"If the defendant satisfies" the first step, "the burden then shifts to the plaintiff to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Herring Networks*, 8 F.4th at 1155.[9] "The district court must grant the defendant's motion . . . if the plaintiff presents an insufficient legal basis for the claims or no reasonable jury could find for the plaintiff." *Id.* (internal quotation marks omitted). The anti-SLAPP statute must be construed "broadly" to further the purpose of "allowing for early dismissal of meritless First Amendment cases aimed at chilling expression through costly, time-consuming litigation." *Id.*

## B.    The First Step in the Anti-SLAPP Analysis Is Satisfied

Each of Plaintiffs' five "counts" in their Complaint is based on and arises entirely from the contents of the Website. Compl. ¶¶ 35–36, 46–48 (Count I for defamation as to Stephen Hendel), 61–63 (Count II for defamation as to Ruth Hendel), 75–77 (Count III for defamation as to KFE), 89 (Count IV for false light as to Stephen Hendel), 98 (Count V for false light as to Ruth Hendel). A defendant need only show that its alleged conduct "fits *one* of the four categories spelled out in section 425.16, subdivision (e)." *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002) (emphasis added). By alleging statements and conduct based exclusively on statements on the Website, Plaintiffs' Complaint fits three of Section 425.16(e)'s subdivisions: Sections 425.16(e)(2), (e)(3), and (e)(4).

### 1.    Each of the claims in the Complaint fits within Section 425.16(e)(2) because the Website contains statements concerning the Pappy Litigation.

Section 425.16(e)(2) applies to "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body." A

---

[9] The Court may strike *portions* of claims under Section 425.16. *City of Colton v. Singletary*, 206 Cal. App. 4th 751, 774 (2012) ("[A] portion of a cause of action may be stricken if it falls within anti-SLAPP protections.").

statement is made "'in connection with' litigation under section 425.16,

subdivision (e)(2) if it relates to the substantive issues in the litigation and is directed

to persons having some interest in the litigation." *Neville v. Chudacoff*, 160 Cal. App.

4th 1255, 1266 (2008).

In the Pappy Litigation, Stephen Hendel (through S&H Desert Depot, his

investment vehicle for his participation in Moresco and Hendel's April 2021 purchase

of Pappy & Harriet's) alleges 10 causes of action against Moresco and Elin that all

arise directly out of their purchase of Pappy & Harriet's. *See generally* SAC; *see also*

Compl. ¶¶ 20–21 (describing the Pappy Litigation).

The Website contains multiple references to the substantive issues in the Pappy

Litigation. For example, the Website asks, "Why is Steve Hendel litigating creators

who have track records of success and are having tremendous success with the

INVESTMENT he made in Pappy + Harriet's?" Ex. 2 at 1. This is a direct reference

to Hendel's investment in Pappy & Harriet's, which is squarely at issue in the Pappy

Litigation. *See, e.g.*, Ex. 1 ¶ 1 ("This case arises out of [Moresco, Elin, and others']

brazen betrayal of their own 'white knight' investors in the legendary Pioneertown,

California restaurant and bar and music venue called 'Pappy & Harriet's.'") (defined

terms omitted). The Website similarly asks, "Why is Stephen Hendel suing the

Principles of Pappy and Harriet's, who wholly got into the deal without anyone

(including Hendel), funded the deal up until Hendel's investment, negotiated the deal,

transitioned the business from former owners in the midst of the pandemic, grew the

business, and continued to expand the business?" Ex. 2 at 31. This too relates directly

to the Pappy Litigation, which specifically addresses Moresco and Elin's negotiations

to purchase Pappy & Harriet's before Hendel got involved. *See, e.g.*, Ex. 1 ¶¶ 20–23

(describing Moresco and Elin's "discussions with the prior owners of Pappy &

Harriet's" beginning in "the Fall of 2020," before other investors got involved).

Indeed, Plaintiffs all but concede that their Complaint arises under

Section 425.16(e)(2) when they allege that that "Defendants Elin and Moresco have

raised a series of issues in the Pappy Litigation which are *specific to that case, but are also referenced on the Website*." Compl. ¶ 6 (emphasis added) (listing statements). The Complaint also surmises that "the Website content was published by someone who had a specific interest in … affecting the outcome of that litigation [the Pappy Litigation]." *Id.* ¶ 28.[10]

>           2.    **Each of Plaintiffs' claims also fall within Sections 425.16(e)(3) and (e)(4) because they depend entirely on the exercise of free speech in a public forum in connection with multiple public figures and matters of public interest.**

Plaintiffs' entire Complaint also arises under Sections 425.16(e)(3) and (e)(4). Section 425.16(e)(3) applies to "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. Proc. § 425.16(e)(3). "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006); *accord Cole v. Patricia A. Meyer & Assocs., APC*, 206 Cal. App. 4th 1095, 1121 (2012) ("An Internet Web site that is accessible to the general public is a public forum.").

Section 425.16(e)(4) applies to any "conduct in furtherance of the exercise of" the right of free speech "in connection with a public issue or an issue of public

---

[10] As is discussed below, *infra* at 18–20, each of the Website statements alleged in paragraph 26 of the Complaint has been publicly reported on, either in the press or publicly available court documents (or both). Plaintiffs' suggestion that it would have been "difficult if not impossible for a third party to cull this same information" from publicly available sources, Compl. ¶ 26, is therefore unfounded. Nevertheless, the focus at step one is on the factual allegations in this case—i.e., what Plaintiffs *allege* about the Website—not who *actually* created or published the Website. For example, in *City of Costa Mesa v. D'Alessio Invs., LLC*, 214 Cal. App. 4th 358 (2013), the cross-complainant alleged that government employees made allegedly defamatory statements, and submitted declarations supporting such allegations. *Id.* at 368–69. The employees denied making the statements and brought an anti-SLAPP motion. *Id.* at 367–68. The court held that the cross-defendant employees had satisfied the first step in the anti-SLAPP analysis as to all of the alleged statements even though they denied making the statements. *Id.* at 375. Likewise, Defendants here may contest that they played any role in the Website's creation or publication while simultaneously arguing that alleged statements on the Website fall within the ambit of the anti-SLAPP statute.

interest," Cal. Code Civ. Proc. § 425.16(e)(4).  While Sections 425.16(e)(3) and (e)(4) are similar, subsection (e)(4) is broader because it does not include a "public forum" requirement and applies to even private communications if they occur "in connection with a public issue or an issue of public interest." *Id.*; *see also Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1117–18 (1999).

      Section 425.16(e)(3) and (e)(4)'s public interest requirements must be "construed broadly so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest." *See Gilbert v. Sykes*, 147 Cal. App. 4th 13, 23 (2007) (construing Section 425.16(e)(3), which contains the identical "public interest" requirement). "[A]n issue of public interest" under Section 425.16(e) "is any issue in which the public is interested." *Nygård, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008) (construing Section 425.16(e)(3)). In determining whether an issue is a matter of public interest, courts may consider "whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occur[red] in the context of an ongoing controversy, dispute or discussion[.]" *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145 (2019).[11] Courts will "broadly construe" what is considered an "ongoing controversy, dispute or discussion." *Cross v. Cooper*, 197 Cal. App. 4th 357, 383 (2011). In *Geiser v. Kuhns*, the California Supreme Court recently confirmed that challenged speech, "considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." 13 Cal. 5th 1238, 1253 (2022).

      The Ninth Circuit has similarly held that courts "must construe . . . 'issue of public interest' in section 425.16(e)(4) broadly" to include, among other categories,

---

[11] Unless otherwise noted, internal quotation marks and citations are omitted, and emphases are added.

"statements concerning a person or entity in the public eye" and any "topic of widespread, public interest." *Hilton v. Hallmark Cards*, 599 F.3d 894, 906 (9th Cir. 2010). In *Hilton*, the Ninth Circuit found the requisite public interest in a greeting card prominently featuring socialite Paris Hilton's animated likeness along with her trademarked catch phrase, "That's hot." *Id.* at 906–07. Hilton argued that Hallmark's use of her likeness in a greeting card failed to implicate an "*issue* of public interest because [the card] inolve[d] no issue at all, only a celebrity who interests many people." *Hilton*, 599 F.3d at 905 (emphasis in original). The Ninth Circuit disagreed, concluding that "Hallmark's card is 'in connection with a public issue or an issue of public interest'" under Section 425.16(e)(4) because "Hilton is a person 'in the public eye' and 'a topic of widespread public interest." *Id.* at 907; *see also Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 397–98 (2004) (online posts regarding cat breeding were in connection with a matter of public interest "[g]iven the controversy surrounding the parties' dispute and its evident notoriety in the cat breeding community").

All of Plaintiffs' allegations in this case depend entirely on statements published on the Website. *See generally* Compl. And the Website contains statements about multiple public figures (namely Steve and Ruth Hendel and Nigerian musician Fela Kuti) that implicate multiple public issues, including the very public controversy surrounding Moresco and Elin's purchase of Pappy & Harriet's, the lasting cultural impact of Fela Kuti's legacy, and the Hendels' public support for Kuti despite Kuti's problematic relationship with women, particularly following the #MeToo movement.

### a.    The Pappy Litigation is an issue of public interest.

In addition to implicating Section 425.16(e)(2), the Website's multiple references to the Pappy Litigation are statements concerning an issue of ongoing public interest and controversy that also fall under Sections 425.16(e)(3) and (e)(4). Prominent mainstream press coverage of the Pappy Litigation in the *Los Angeles Times*, *Billboard*, and *The Desert Sun* reflect and confirm the public's interest in the

SPECIAL MOTION TO STRIKE COMPLAINT

parties' ownership dispute over the popular Pappy & Harriet's. *See* Exs. 2–4. And by discussing the specific substantive issues in the Pappy Litigation, *see supra* at 8–9, the Website not only "refer[s] to an issue of public interest," but also "contributes to or furthers the public conversation on an issue of public interest." *FilmOn.com*, 7 Cal. 5th at 154.

### b. Stephen and Ruth Hendel are public figures about whom the Website contains statements on issues of public interest.

#### i. Stephen Hendel the oil commodities trader

A plaintiff can reveal himself to be a person in the public eye by virtue of the allegations in his complaint. *See Nadel v. Regents of the Univ. of Cal.*, 28 Cal. App. 4th 1251, 1269–70 (1994); *Thomas v. L.A. Times Commc'ns, LLC*, 189 F. Supp. 2d 1005, 1011 (C.D. Cal. 2002); *cf. Copp v. Paxton*, 45 Cal. App. 4th 829, 845-46 (1996) ("It is not necessary to show that a plaintiff actually achieves prominence in the public debate; it is sufficient that a plaintiff attempts to thrust himself into the public eye.") (cleaned up). Stephen Hendel has done that here by describing himself in the Complaint as "a respected businessman" who "built a career in the financial sector with extensive experience in commodities" and "is regularly sought out for his experience in the international commodities merchant business." Compl. ¶ 16; *see also* Ex. 7 at 1 (*New York Times* article describing Stephen Hendel as a "prominent commodities trader in New York").

External sources confirm Stephen's public prominence in the commodities trading industry. During his 16 years as an oil commodities trader at Goldman Sachs, Stephen helped build Goldman's commodities business into one of the largest in Wall Street in the 1990s. Ex. 8 at 2. After leaving Goldman, Stephen co-founded his own private, international commodities business, Hess Energy Trading Company (now Hartree Partners, where he is a managing director). Ex. 7 at 1; Ex. 8 at 2; Ex. 9 at 6 Ex. 10. Stephen Hendel's storied career as a "prominent commodities trader" is therefore consistent with Website's explanation that Hendel "is a billionaire who

made his money trading oil commodities." Ex. 2 at 1. And by questioning and expressing strong opinions about the social and global value of dealing in oil commodities ("Why does Hendel deal in African blood money and oil commodities?"[12]), the Website contributes to the public conversation about Hendel's prominent role in oil commodities trading. *FilmOn.com*, 7 Cal. 5th at 154.

### ii.    Stephen and Ruth Hendel the producers

Stephen's wife, Ruth, likewise alleges in the Complaint that she is a public figure as "a theater producer" who "has been involved . . . in a number of successful Broadway and Off-Broadway productions." Compl. ¶ 17; *see also* Ex. 10. While she claims that her success has been "behind the scenes," Ruth boasts that she "has received 17 Tony Award nominations and won 11 Tony Awards" for her producing work and "is also vice chair of the board at the Eugene O'Neill Theater Center." Compl. ¶ 17. Thus, in addition to being a public figure through her marriage and association with Stephen Hendel, *Carlisle v. Fawcett Pubs., Inc.*, 201 Cal. App. 2d 733, 747 (1962), Ruth Hendel is a public figure in her own right as a prominent and successful theater producer.

Stephen's discovery and love of the music of a Nigerian Afrobeat musician, Fela Kuti, also led him to produce—with Ruth, Compl. ¶ 16—his own Broadway musical—"Fela!"—about Kuti, Ex. 7 at 1. Stephen contributed "the bulk of the $11 million capitalization" for the musical; other investors included Jay-Z and Will and Jada Pinkett Smith. *Id.* at 2. In 2010, "Fela!" tied for the most Tony Awards nominations that year (11), of which it won three. Ex. 7 at 2; Ex. 12 at 3. Since its debut in 2008, more than a million people have seen "Fela!" in the United States and England. Ex. 12 at 3.

The Website questions why "black celebrities like Fela's fellow public Oscars slapper, Will Smith, his wife Jada Pinkett Smith, Beyonce and Jay Z invest[ed] with

---

[12] Ex 2 at 22; *see also* Compl. ¶ 36(h).

the Hendels to produce 'Fela' on Broadway." Ex. 2 at 8. The Website's theory contributes to or furthers the public conversation on this issue by proposing that the Hendels used these celebrities to lend credibility and financial success to the production of "Fela!": "Most likely they were paid by the Hendel's [sic] to drive the press machine. Stephen calculated that two rich people living in Westchester wasn't a good PR look to make the production a financial success." Ex. 2 at 8.

### c.   Fela Kuti was a public figure about whom the Website contains statements on issues of public interest.

The Website devotes considerable attention to Fela Kuti and Stephen Hendel's fascination with him.

Fela Kuti was a prominent Nigerian musician and political activist in the 1960s and 1970s. *E.g.*, Ex. 7 at 1 (describing Kuti as "a fiery, sexy, anticapitalist singer from Nigeria"); Ex. 13 at 1; Ex. 14 at 1. Widely recognized as a pioneering figure in the Afrobeat music genre,[13] *e.g.*, Ex. 13; Ex. 14 at 1, Kuti was also an outspoken critic of Nigeria's "corrupt dictators" and military government. *E.g.*, Ex. 15 at 2; Ex. 13. At least one source dubs Kuti "the mouthpiece of Nigerian counterculture in the 1970s," Ex. 16 at 1, and his "music and outspokenness made Fela a hero to Africa's poor," Ex. 15 at 2. In the late 1960s or 1970s, Kuti founded a communal compound called the Kalakuta Republic, which Nigerian authorities frequently raided. *E.g.*, Ex. 15 at 1–2; Ex. 16 at 1–3. During the raids, Kuti and his followers were frequently arrested and beaten, with one such raid leading to the death of Kuti's mother, who was thrown from a window. Ex. 15 at 2; Ex. 16 at 2–3.

Kuti was also known for his complicated relationship with and portrayal of women. In 1978, he infamously married 27 women in one day. *E.g.*, Ex. 13 at 1; Ex.15 at 5; Ex. 16 at 3, 4. Kuti's polygamy and lyrical objectification of women has

---

[13] Afrobeat fuses American blues, jazz, and funk with traditional Yoruba music. Ex. 13 at 1.

spawned academic debate about the role of misogyny in Kuti's legacy. *E.g.*, Ex. 17 at 5 ("the lyrical content of Kuti's music[] exemplifies not only how popular media culture can contribute to the normalization of sexist, abusive, and violent behavior toward women, but also how it reflects the powerful and male dominated global society we live in, where women are sexually objectified on a regular basis"), 41 ("Asides the sexist lyrics of Kuti's songs, his relationship with women, including his wives, and utterances about them, cast him in the role of a sexist and misogynist."); Ex. 18 at 2 (suggesting "that Fela's fame in the West is not in spite of his polygyny and misogyny, but at least in part because of them").

The Website takes issue not only with Fela Kuti individually, but also the Hendels' association with him. It explains that "Fela Kuti was publicly outed several years ago" for his misogyny, Ex. 2 at 15–16, and frequently references Kuti's marriage to 27 women in one day, *id.* at 1, 15. The Website explains that Hendel "owns the Fela Kuti catalogue and has an odd fixation with the late Nigerian musician," *id.* at 1, and opines that by glorifying Kuti, the Hendel-produced musical "Fela!" is "making more blood money off the rape, molestation and abuse of children and women" *id.* at 15; *see also* Compl. ¶ 36(a). The Website further suggests that Ruth Hendel's association with Stephen Hendel and "Fela!" betrays the "#MeToo movement" by revealing herself (in the Website's opinion) to be "the prototypical rich housewife who cares more about money to fuel her (and Stephen's) lavish lifestyle than protecting other women." Ex. 2 at 6; *see also* Compl. ¶ 36(k).

Viewed as a whole and in context, the Website undeniably employs rhetorical hyperbole to repeatedly—and forcefully—condemn the Hendels' motives for, and the broader social consequences of, publicly celebrating Fela Kuti, all while simultaneously expressing negative opinions of the Hendels' wealth and lifestyle. In doing so, the Website directly contributes to the public discussion of Fela Kuti himself and the Hendels' connection to him.

1                                    *        *        *

2        These are just a few examples of the many ways Plaintiffs' entire Complaint,

3   and each claim therein, arises from speech on matters of public interest, therefore

4   falling within the ambit of Sections 425.16(e)(3) and (e)(4).

5        **C.    Plaintiffs Cannot Satisfy Their Burden on the Second Step of the Anti-SLAPP Analysis Because Defendants Did Not Publish the Website**

6

7        "If the defendant meets its burden [at step one of the anti-SLAPP analysis], the

8   burden shifts to plaintiff to demonstrate a probability of prevailing on the merits of

9   each of plaintiff's claims" that fall within the anti-SLAPP statute's ambit. *Doe v.*

10  *Gangland Prods., Inc.*, 730 F.3d 946, 953 (9th Cir. 2013). Plaintiffs cannot satisfy

11  their burden on step two, because neither Moresco nor Elin published or contributed

12  to the Website—or any statement on the Website—at all, including but not limited to

13  the allegedly defamatory statements.[14]

---

14  [14] Because Defendants did not publish (or "cause to be" published, Compl. ¶ 34) any of the allegedly "false, misleading, and defamatory" statements alleged in the

15  complaint, *see id.* ¶¶ 34–35, 46–48 (Count I for defamation as to Stephen Hendel), 61–63 (Count II for defamation as to Ruth Hendel), 75–77 (Count III for defamation

16  as to KFE), 89 (Count IV for false light as to Stephen Hendel), 98 (Count V for false light as to Ruth Hendel), the Court need not address whether any of the alleged

17  statements themselves may serve as the basis for defamation or false light claims. Nevertheless, none of the alleged statements are actionable at all, against *any*

18  potential defendant, because the broader context of the statements—particularly their presence on an internet website using hyperbolic language—so completely negates

19  the impression that the statements were asserting an objective fact that "a reasonable factfinder could only conclude that the statement[s]" were "of opinion not fact." *E.g.*,

20  *Herring Networks*, 8 F.4th at 1157–59 (affirming the district court's conclusion that Rachel Maddow's statement on a segment of her show that that conservative news

21  outlet One American News Network "really literally is paid Russian propaganda," when analyzed in the context of Maddow's show, was an nonactionable statement of

22  opinion, not fact); *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1293–94 (9th Cir. 2014) (blog posts accusing plaintiffs "of engaging in 'illegal activity,' including

23  'corruption,' 'fraud,' 'deceit on the government,' 'money laundering,' 'defamation,'" and other misconduct "in the context of a non-professional website containing

24  consistently hyperbolic language" were "not sufficiently factual to be proved true or false") (internal quotation marks omitted); *Global Telemedia Int'l, Inc. v. Doe 1*, 132

25  F. Supp. 2d 1261, 1267 (C.D. Cal. 2001) (anonymously posted statements in internet bulletins and chat rooms, including comments the plaintiffs argued made allegations

26  of criminal misconduct, lend themselves to constitutional protection because they "are full of hyperbole, invective, short-hand phrases and language not generally

27  found in fact-based documents"); *Nicosia v. DeRooy*, 72 F. Supp. 2d 1093, 1101, 1104 (N.D. Cal. 1999) (reasoning that statements published "through Internet

28

---

-16-                                    SPECIAL MOTION TO STRIKE COMPLAINT

Under California law, "defamation 'involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage.'" *Herring Networks*, 8 F.4th at 1157 (quoting *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007)). Publication is therefore an indispensable element of a defamation claim. *See Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1369 (2010). Publication is likewise an indispensable element of a claim for false light invasion of privacy. *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1264 (2017) (false light requires "publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person"); *Atl. Recording Corp. v. Serrano*, No. 07-CV-1824 W(JMA), 2007 WL 4612921, at *7 n.8 (S.D. Cal. 2007) ("To the extent Defendant's invasion of privacy claims rest on . . . [a] false light theor[y], [this] theor[y] require[s] some sort of 'public disclosure' or 'publication.'") (citing cases). "When claims for ['false light'] invasion of privacy . . . are based on the same factual allegations as those of a simultaneous libel claim, they are superfluous and *must be dismissed*." *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491, 1504 (1995) (emphasis added).

Plaintiffs allege that Defendants made "and/or cause[d] to be made" thirteen "false and misleading statements" about Stephen Hendel, Ruth Hendel, and KFE on the Website. Compl. ¶ 34–36. The sole basis for Plaintiffs' belief *Moresco and Elin* published those statements (or somehow caused them to be published) appears to be their speculation, based on the contents of four statements on the Website, that "the Website content was published by someone who had a specific interest in or knowledge of Elin and Moresco's factual and legal theories specific to the Pappy Litigation and in affecting the outcome of that litigation." Compl. ¶¶ 26–28.

---

discussion groups as part of a heated debate concerning a bitter legal dispute" made it "less likely" that the statements could be viewed as "assertions of fact" and holding that "statements accusing [the plaintiff] of being a 'fraud,' a 'criminal' and acting illegally are rhetorical hyperbole").

Plaintiffs' speculation is entirely misplaced. Neither Moresco nor Elin created or published—or played any role in the creation or publication of—the Website or any of its contents. Moresco Decl. ¶¶ 5–7; Elin Decl. ¶¶ 5–7. Nor did they suggest, solicit, or encourage any person to publish the Website or any of its contents. Moresco Decl. ¶¶ 5, 7; Elin Decl. ¶¶ 5, 7. Moresco and Elin didn't even know about the Website until they found out they had been sued over it. Moresco Decl. ¶ 4; Elin Decl. ¶ 4. Moresco and Elin *categorically and unequivocally* deny any involvement in the publication of the Website. Moresco Decl. ¶ 5; Elin Decl. ¶ 5.

Plaintiffs' *sole* theory of publication is that "Elin and Moresco have raised a series of issues in the Pappy Litigation which are specific to that case" that would have been "difficult" for a third party to cull "from *publicly available* filings in the Pappy Litigation to publish on the Website." Compl. ¶ 26. But ***all*** of these four "issues" that the Complaint lists have been widely discussed online ***and in the media***—not just in admittedly "publicly available" court filings. For example, the Complaint contends that statements on the Website about Plaintiff Knitting Factory Entertainment's "being lawfully terminated for breaching their talent agreement and attempting to book a music festival that would violate the venues [sic] Conditional Use Permit" "is one of Moresco and Elin's central theories in the Pappy Litigation." Compl. ¶ 26(a). Perhaps that's why the *Los Angeles Times* publicly reported on that "central theor[y]" in an article specifically about the Pappy Litigation, noting that Moresco and Elin had argued that Stephen Hendel and Knitting Factory's "plans for Pappy's . . . would cause the venue to exceed the number of concerts allowed by the venue's conditional-use permit." Ex. 3 at 6.

Plaintiffs likewise argue that comments on the Website about Knitting Factory Entertainment "prey[ing] on … Phil Pirrone who created Desert Daze" "concerns one of Moresco and Elin's theories in the Pappy Litigation." Compl. ¶ 26(c). But here too, Phil Pirrone and Desert Daze factor heavily in public reporting about the Pappy Litigation. *E.g.*, Ex. 3 at 6 (quoting statements that "Phil Pirrone, Knitting Factory

SPECIAL MOTION TO STRIKE COMPLAINT

Entertainment booking agent and Desert Daze music festival founder, said in a declaration submitted to the court"); Ex. 4 at 4 (". . . Desert Daze Deconstructed[] was to be a new format for the Desert Daze festival, which [Knitting Factory C.E.O. Morgan Margolis] and festival founder Phil Pirrone had partnered on since 2016."); Ex. 5 at 2 ("Desert Daze founder Phil Pirrone was hired by [Knitting Factory Entertainment] to be Pappy and Harriet's talent buyer.").

The Complaint further contends that the statement on the Website "Live Nation acquire[d] . . . Spaceland Presents" "has been an obscure topic of inquiry by Moresco and Elin's counsel throughout the Pappy Litigation." Compl. ¶ 26(b). Even if that were true (which Defendants do not concede), the fact that Live Nation acquired Spaceland Presents was widely reported when it occurred years ago, in May 2019— including, again, in the *Los Angeles Times*. *E.g.*, Exs. 19–20.

Finally, Plaintiffs are particularly focused on a statement on the Website that "S&H Desert Depot . . . HAS YET to register in California (it is a Delaware LLC) . . . to shield the true ownership." Compl. ¶ 26(d) (quoting the Website). Plaintiffs contend this statement must reveal Moresco and Elin as the Website's creators and publisher because the statement "concerns S&H's capacity to maintain litigation in California and thus relates to the Pappy Litigation because S&H is not a party to any other litigation," *id.*—a fact they contend nobody would care about outside the litigation, *see* Payne Decl. ¶ 2. This argument ignores that S&H Desert Depot is a named plaintiff in the Pappy Litigation, which has received considerable media attention. *E.g.*, Exs. 3–5. In fact, the leading newspaper local to Pioneertown and surrounding areas, *The Desert Sun*, specifically names S&H Desert Depot, explaining that "[a] non-binding term sheet" regarding Defendants' purchase of Pappy & Harriet's "was signed in early March 2021 promising Hendel's investment vehicle— initially referred to as Dundee Productions Inc. and later S&H Desert Depot—a 50.5% ownership stake in the partnership controlling Pappy & Harriet's." Ex. 5. Moreover, the operative complaint in the Pappy Litigation describes S&H Desert

SPECIAL MOTION TO STRIKE COMPLAINT

Depot as "a limited liability company organized under the laws of Delaware," Ex. 1 ¶ 12, and one of three parties (along with Moresco and Elin) of the Term Sheet for the purchase of Pappy & Harriet's, *id.* ¶ 36. Yet despite bringing a lawsuit in California state court in June 2021, readily accessible business records on the California Secretary of State's website reveal that S&H Desert Depot did not register as a California LLC until just a few months ago, on September 14, 2023. Ex. 21. Anyone with even a passing interest in the Pappy Litigation could have discovered this information with considerable ease.[15]

Given the public's intense interest in the Pappy Litigation—an acrimonious dispute over a popular bar, restaurant, and music venue that has engendered heated discussion online and in the press about all of the parties involved in that litigation— it is likely that any number of people could harbor animus towards the Hendels and Knitting Factory Entertainment, particularly in the music industry. But Plaintiffs have no evidence that *Moresco and Elin* played any role in the Website's creation or publication because no such evidence exists.

---

[15] In fact, there is readily available evidence online that individuals are actively conducting online business searches on the California Secretary of State's website for other entities connected with the Pappy Litigation. For example, a comment to a post about Desert Daze on the popular community discussion board website Reddit expresses frustration about the cancelation of the Desert Daze festival that Phil Pirrone founded and states: "Go to https://bizfileonline.sos.ca.gov/search/business and search for Desert Daze LLC, then look at the statements of information in 2018, you will see both Phil Pirrone and Morgan Margolis on there. Now check out 2021 and you will see Bravo Entertainment LLC as the main entity name (the same entity TERMINATED FOR HIRING PIRRONE) and Moon Block listed below (Phil's promotion company). This tells me Phil went from being the main guy back in 2018 straight down to the bottom of the pile in 2021." Ex. 25 at 2; *see also* Ex. 26 (on a separate post to the DesertDaze Subreddit titled "Pirrone is the victim here," the same commenter references his or her earlier comment about what he or she found "on the CA SOS website"). These online discussions reflect the public's deep interest in the individuals and entities connected with the Pappy Litigation and the general public's capacity to perform simple business searches online outside the context of litigation.

IV.    **CONCLUSION**

Defendants Joseph Moresco and Lisa Elin respectfully request that the Court grant their anti-SLAPP motion and dismiss Plaintiffs' Complaint, in its entirety, with prejudice and without leave to amend.

Dated:  December 18, 2023                    JASSY VICK CAROLAN LLP

By:    */s/ Jeffrey A. Payne*
Jeffrey A. Payne

Attorneys for Defendants
JOSEPH MORESCO and LISA ELIN

SPECIAL MOTION TO STRIKE COMPLAINT